UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
HUMBERTO RIVERA, JR.,                              :
                     Plaintiff,               :
v.                                                 :
                                   :
TOWN OF NEW FAIRFIELD; NEW                         :
FAIRFIELD RESIDENT TROOPER'S                       :          **OPINION AND ORDER**
OFFICE; FIRST SELECTMAN PATRICIA                   :
DEL MONACO; SELECTMAN KHRIS HALL;                  :          22 CV 1874 (VB)
SELECTMAN KIM HANSEN; PO/TROOPER                   :
DAVID KOONITSKY; PO/TROOPER JAMIE                  :
OLSOWY; PO/TROOPER JAMES KING; and                 :
PO/TROOPER DAVID THARAS,                           :
                     Defendants.              :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Humberto Rivera, Jr., proceeding pro se, brings this action against defendants

Town of New Fairfield (the "Town"), New Fairfield Resident Trooper's Office (the "Office"),

First Selectman Patricia Del Monaco, Selectman Khris Hall, Selectman Kim Hansen, and

PO/Trooper David Koonitsky (collectively, the "New Fairfield Defendants"), as well as against

defendants PO/Trooper James King, PO/Trooper Jamie Olsowy, and PO/Trooper David Tharas

("Connecticut State Trooper Defendants").  Plaintiff alleges defendants unlawfully entered and

searched plaintiff's home, detained plaintiff there, and facilitated the removal of plaintiff's

daughter from the home, in violation of plaintiff's constitutional rights and state law.

      Now pending is the New Fairfield Defendants' motion and the Connecticut State Trooper

Defendants' motion to dismiss the third amended complaint under Rule 12(b)(6).  (Docs. ##71,

75).

      For the following reasons, the motions are GRANTED IN PART and DENIED IN

PART.

      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

# BACKGROUND

For the purpose of ruling on the motions to dismiss, the Court accepts as true all well-pleaded factual allegations in the third amended complaint and certain factual allegations in plaintiff's opposition, and draws all reasonable inferences in plaintiff's favor, as summarized below.[1]

Plaintiff alleges that on March 2, 2019, at about 11:15 p.m., the Connecticut State Trooper Defendants entered his home without a warrant in Patterson, New York, while plaintiff was asleep in his eight-year-old daughter's bedroom.  Plaintiff's home is adjacent to the Connecticut state line.

After entering, defendant Tharas purportedly "loudly yelled . . . Mr. Rivera!" into plaintiff's daughter's bedroom where plaintiff was sleeping, and Tharas and defendant Olsowy entered the bedroom.  (Third Am. Compl. ("TAC") ¶ 14).  According to plaintiff, Tharas asked plaintiff if he was alright.  Tharas then allegedly asked plaintiff if he had a daughter, to which plaintiff said "yes"; whether he was intoxicated, to which plaintiff said "no"; and whether he took his daughter's phone, to which plaintiff also said "no."  (Id. ¶¶ 22, 24–25).  Plaintiff contends Tharas said plaintiff did not look intoxicated, and that defendants Tharas and Olsowy could "physically see [plaintiff's daughter's] phone was located next to them . . . plugged into an

---

[1]  Because plaintiff is proceeding pro se, the Court considers new allegations in the opposition, to the extent they are consistent with the complaint.  See Kelley v. Universal Music Grp., 2016 WL 5720766, at *6 (S.D.N.Y. Sept. 29, 2016).

Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

Plaintiff will be provided copies of all unpublished opinions cited in this decision.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

outlet charging up." (TAC ¶ 28).  Plaintiff also alleges he asked Tharas and Olsowy where his daughter was and they did not respond.

Tharas allegedly told plaintiff that his daughter's mother had "called and said your daughter didn't want to be here and that you took her phone." (TAC ¶ 29).  In response, plaintiff alleges he told the officers that the mother "did this because I found out she wasn't taking my daughter to school." (Id. ¶¶ 26, 31).

Then, according to plaintiff, Tharas placed a chair behind plaintiff, "tap[ped] him on the shoulder," and told him to "sit down and relax." (TAC ¶¶ 32–33).  After being asked if he had been drinking that day, plaintiff alleges he said he had a beer at 3:00 p.m. and a glass of wine at dinner but was not intoxicated. At some point, plaintiff also alleges Tharas stated "it sucks that they treat you guys this way" (id. ¶ 39), which plaintiff understood to be a reference to plaintiff's status as a father in "similar family situations." (Id. ¶ 40).

Plaintiff alleges Tharas asked him if his home was in Connecticut or New York, and when plaintiff responded his home was in New York, Tharas and Olsowy "looked at each other" and Tharas told Olsowy "I had a feeling." (TAC ¶ 42).  Plaintiff then alleges he asked why these defendants, Connecticut state troopers, were at his home.  Tharas allegedly explained "sometimes the calls get crossed." (TAC ¶ 43).  At this point, plaintiff demanded the troopers leave his home, stating "you guys shouldn't be in my home, . . . you're violating my rights." (Id. ¶ 46).  According to plaintiff, the Connecticut State Trooper Defendants already knew plaintiff's residence was not in Connecticut because they had spoken to a neighbor and asked the same question.

Speaking into his radio, Tharas allegedly said they "need New York here [because] this is a New York address," and told plaintiff they would wait at plaintiff's residence until New York police officers arrived on scene to continue the investigation.  (TAC ¶¶ 47–49).  While waiting

for the New York officers to arrive, Tharas allegedly asked Olsowy to "go get [plaintiff's daughter's] identification," and also asked plaintiff for his identification.  Plaintiff further alleges he tried to sit up from the chair to get his identification but Olsowy told plaintiff to remain seated and said, "I'll get it . . . where is it?"  (Id. ¶¶ 50–53).  Plaintiff alleges he "involuntarily" pointed toward cabinets "out of fear," but that he did not consent to a search.  (Id. ¶ 52).  According to plaintiff, Olsowy proceeded to search the cabinets, opening the first drawer, and asked plaintiff if his identification was in there.  Plaintiff responded no, so Olsowy allegedly opened the next drawer and asked plaintiff the same question, to which plaintiff allegedly responded yes.  Olsowy allegedly found plaintiff's wallet in the second drawer, and gave it to plaintiff to take out his identification.  Plaintiff further alleges Olsowy then walked out the door with the plaintiff's identification and told defendant King that plaintiff was not intoxicated.  At this point, plaintiff alleges King, who was standing guard at the side door, held the door open for New Fairfield Defendant Koonitsky to enter the home.

Koonitsky allegedly "walk[ed] right in and [stood] next to [plaintiff] on his right-hand side," telling plaintiff "you know it doesn't look right but sometimes it's better this way," which plaintiff interpreted as referring to "the struggles of fathers and men such as" plaintiff.  (TAC ¶ 59).  According to plaintiff, the three officers then casually continued conversations, including several references to the fact that plaintiff was not intoxicated, until they left the home.  Plaintiff alleges these defendants were in his home for almost an hour, from approximately 11:15 p.m. on March 2 through 12:15 a.m. on March 3, 2019.  At some point during this time, plaintiff alleges he asked Tharas for his name, to which Tharas responded his last name was "Stevenson."  (Id.

¶ 66).  Also at some point, plaintiff alleges one of these defendants removed plaintiff's daughter from the home.  (Opp. at 3–4).[2]

Plaintiff contends the policies and customs of defendants the Town and the Office permitted this alleged unconstitutional search and seizure and false imprisonment of plaintiff, as well as the taking of his daughter from him in violation of due process.  Moreover, plaintiff contends New Fairfield Defendants Del Monaco, Hall, and Hansen are liable for failure to adequately train and/or supervise the officers who entered his home.

**DISCUSSION**

I.    Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under "the two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a

---

[2]    Plaintiff's opposition to defendants' motions is filed in three separate parts in Docs. ##81–83.  The Court refers to these documents collectively as "Opp." and citations thereto refer to the numbered pages of the Opp.

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

The Court must liberally construe submissions of pro se litigants and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (collecting cases). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however, . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). Nor may the Court "invent factual allegations" a plaintiff has not pleaded. Id.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 111. "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." Id. "However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." Id.

## II.   Fourth Amendment Claims

Plaintiff alleges defendants Tharas, Olsowy, King, and Koonitsky violated his[3] Fourth Amendment rights by unlawfully (i) entering and searching plaintiff's home, and (ii) detaining him within his home.

---

[3]   To the extent plaintiff attempts to assert claims on his daughter's behalf, such claims must be dismissed because a pro se litigant "is not empowered to proceed on behalf of anyone other than himself." McCall v. Pataki, 232 F.3d 321, 324 (2d Cir. 2000); see also Southerland v.

These defendants argue plaintiff has failed to state a Fourth Amendment claim. The Court disagrees.

A.     Legal Standard

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, prohibits "unreasonable searches" of the home by law enforcement.  U.S. Const. amend. IV. Under the Fourth Amendment, warrantless searches and seizures inside a home are "presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 586 (1980).

However, "[t]he Fourth Amendment does not require law enforcement to obtain a warrant to search a home if exigent circumstances exist, including the need to assist persons who are seriously injured or are threatened with imminent injury."  United States v. Laurent, 33 F.4th 63, 95 (2d Cir. 2022), cert. denied, Laurent v. United States, 143 S. Ct. 394 (2022).  To determine whether exigent circumstances existed, "the core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action."  Id.

Moreover, the Fourth Amendment prohibits "unreasonable . . . seizures."  U.S. Const. amend. IV.  "[T]he first step in any Fourth Amendment claim (or, as in this case, any section 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure."  Medeiros v. O'Connell, 150 F.3d 164, 167 (2d Cir. 1998). A Fourth Amendment "seizure" occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not "free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).

---

Giuliani, 4 F. App'x 33, 37 (2d Cir. 2001) (summary order) ("[A] non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child.").

To allege a cognizable seizure, a plaintiff must allege the officer intended to restrain that individual.  Medeiros v. O'Connell, 150 F.3d at 168.  For example, a bystander who was accidentally shot by a police officer when the officer was struggling with a suspect was not "seized" within the meaning of the Fourth Amendment.  See, e.g., Pickering v. Mercado, 2006 WL 1026677, at **5–7 (E.D.N.Y. Apr. 17, 2006).

If there was a seizure, the Court proceeds to the second step, which is to determine what type of seizure occurred.  There are two relevant types of seizures, each of which requires a different level of justification: (i) an investigatory (or Terry) stop, which must be based on "a reasonable suspicion supported by articulable facts that criminal activity may be afoot"; and (ii) an arrest, which must be based on probable cause.  United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

"Whether a seizure is an arrest or . . . merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances."  Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991).  "As the level of intrusiveness rises, . . . an encounter between the police and a citizen is more properly categorized as an arrest."  Id.  When evaluating whether a Terry stop is sufficiently intrusive to become a de facto arrest:

> the Second Circuit considers the amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

United States v. Wiggan, 530 F. App'x 51, 55 (2d Cir. 2013) (summary order).

B.    Analysis

First, liberally construing plaintiff's submissions and drawing all reasonable inferences in plaintiff's favor, plaintiff plausibly alleges an unlawful search took place when the Connecticut State Trooper Defendants and defendant Koonitsky purportedly entered plaintiff's home while

plaintiff was sleeping, because they did not have a warrant and, assuming the truth of the facts alleged by plaintiff, the officers did not have an objectively reasonable belief that plaintiff's daughter was in "urgent need . . . [of] aid."  Chamberlain v. City of White Plains, 960 F.3d 100, 106 (2d Cir. 2020).

Indeed, in the context of child safety, "[r]isks that a child will suffer actual injury, sexual abuse, or be left bereft of care and supervision can suffice to create an emergency."  E.D. ex rel. V.D. v. Tuffarelli, 692 F. Supp. 2d 347, 361 (S.D.N.Y. 2010), aff'd sub nom. E.D. ex rel. Demtchenko v. Tuffarelli, 408 F. App'x 448 (2d Cir. 2011) (summary order).  However, "the mere possibility of danger does not make it objectively reasonable to believe that the circumstances were exigent."  Rivera v. Leto, 2008 WL 5062103, at *4 (S.D.N.Y. Nov. 25, 2008) (quoting Hurlman v. Rice, 927 F.2d 74, 81 (2d Cir. 1991)) (emphasis added).  A report, like that alleged here, stating a child feels unsafe with her father—absent more detail—does not give rise to a reasonable belief that the child is "seriously injured or threatened with . . . injury."  Brigham City v. Stuart, 547 U.S. 398, 403 (2006).  This is especially true in light of the "heavy burden" on police seeking "to justify a warrantless entry on the basis of exigent circumstances."  Chamberlain v. City of White Plains, 960 F.3d at 106 (quoting Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984)).

Accordingly, plaintiff's Fourth Amendment claim against defendants Tharas, Olsowy, King, and Koonitsky based on the allegedly unconstitutional entry into his home may proceed.

Second, plaintiff adequately alleges defendants seized him by preventing him from exiting his home.  "The proper inquiry [for Fourth Amendment seizure purposes] is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  United States v. Drayton, 536 U.S. 194, 202 (2002).  During the time the officers were in plaintiff's home, they allegedly, among other things, ordered him to stay seated and

would not leave when plaintiff demanded they do so.  The Court may plausibly infer from these facts that a reasonable person in plaintiff's position would not feel free to leave, and therefore he was seized for Fourth Amendment purposes.

These allegations, however, do not support a claim of de facto arrest.  Plaintiff claims the seizure by defendants lasted approximately one hour.  (See TAC ¶ 59). This short duration, as well as the lack of allegations that plaintiff was, for example, handcuffed or that any of the officers brandished a gun at him, strongly weigh against a finding of de facto arrest.  See, e.g., United States v. Stambler, 629 F. App'x 104, 108 (2d Cir. 2015) (summary order) (finding a stop was not a de facto arrest where officer questioned an individual for approximately thirty minutes "[w]ithout brandishing a gun or handcuffing" him).

Although plaintiff has not sufficiently alleged he experienced a de facto arrest, drawing all reasonable inferences in his favor, the officers' detention of plaintiff was a Terry stop requiring reasonable suspicion.  A determination of reasonable suspicion depends on the totality of circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."  United States v. Padilla, 548 F.3d 179, 187 (2008). Further, a "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Reasonable suspicion, unlike probable cause, can even be based on "conduct that is as consistent with innocence as with guilt." United States v. Padilla, 548 F.3d at 187.

Although it is a close call, the Court finds plaintiff has sufficiently alleged his Terry stop detention was not based on a reasonable suspicion.  Plaintiff alleges he was not intoxicated and that the officers should have known the call from his daughter's mother was really made because plaintiff had found out his daughter was excessively late and absent from school when under the

mother's care.  Moreover, according to plaintiff, none of the officers believed plaintiff was intoxicated when they arrived.

Accordingly, plaintiff's Fourth Amendment claim against defendants Tharas, Olsowy, King, and Koonitsky based on his allegedly unconstitutional detention may proceed.

III.    Due Process Claims

Defendants argue plaintiff fails to state a due process claim based on the removal of his daughter from the home against the Connecticut State Trooper Defendants and defendant Koonitsky.

The Court disagrees.

A.    Legal Standard

"Parents . . . have a constitutionally protected liberty interest in the care, custody and management of their children." Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.199 9). "This liberty interest is protected by both the substantive and procedural safeguards of the Due Process Clause of the Fourteenth Amendment." Southerland v. Giuliani, 4 F. App'x at 36 (noting that a due process claim does not require that "parental rights be completely or permanently terminated in order for constitutional protections to apply");  see also Kia P. v. McIntyre, 235 F.3d 749, 758–59 (2d Cir. 2000).

With respect to procedural due process rights, a state actor may not deprive a parent of the custody of his children without a pre-deprivation hearing unless the children are "immediately threatened with harm," in which case a prompt post-deprivation hearing is required.  Tenenbaum v. Williams, 193 F.3d 581, 594 (2d Cir.1999).

With respect to substantive due process rights, state seizure of children is constitutionally permitted only where "case workers have a 'reasonable basis' for their findings of abuse." Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir.1999).

B.      Analysis

Again liberally construing plaintiff's submissions and drawing all reasonable inferences in plaintiff's favor, the Court finds plaintiff sufficiently alleges both a procedural and substantive due process claim,[4] because he has alleged facts which, if true, suggest these officers lacked a reasonable basis to remove his child from his immediate care and that no emergency justified the removal of the child without a hearing or court order.

Indeed, plaintiff alleges the officers verbally confirmed they believed he was not intoxicated and that the officers should have known plaintiff's daughter was not in danger because she had been taken outside the home by an officer and her cell phone was visibly plugged into the wall.  Moreover, here, plaintiff contends the officers had been dispatched based on a specific complaint from his daughter's mother that the daughter no longer wanted to be at plaintiff's home and that plaintiff had taken her phone, neither of which comprise "emergency circumstances" that, at this stage of the proceedings, would justify dismissing plaintiff's due process claims based on the removal of his daughter.  See Tenenbaum v. Williams, 193 F.3d at 594.

Accordingly, plaintiff's procedural and substantive due process claims against defendants Tharas, Olsowy, King, and Koonitsky based on his allegedly unconstitutional detention may proceed.

IV.   Equal Protection Claim

Defendants argue plaintiff fails to state an equal protection claim because he does not allege any defendant acted with discriminatory intent.

The Court agrees.

---

[4]     The Court fairly construes the TAC to assert both procedural and substantive due process claims.

The Constitution's  "equal protection clause directs state actors to treat similarly situated people alike."  Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995).  To state a "selective enforcement" claim under the Equal Protection Clause, a plaintiff must plausibly allege "compared with others similarly situated, [he] was selectively treated; and . . . that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LeClair v. Saunders, 627 F.2d 606, 609–10 (2d Cir. 1980).

While the TAC contains no allegations of discriminatory intent, plaintiff, in his opposition, contends the conduct by the Connecticut State Trooper Defendants and defendant Koonitsky in his home was motivated by a bias against plaintiff's status as a "Hispanic dad living in a middle class neighborhood."  (Opp. at 10).  Thus, plaintiff contends defendants discriminated against him on the basis of his ethnicity and his status as a father.

However, "well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of such a claim and conclusory allegations of selective treatment are insufficient to state an equal protection claim."  Panzella v. City of Newburgh, 231 F. Supp. 3d 1, 8 (S.D.N.Y. 2017) (dismissing complaint when plaintiff failed to identify similarly situated entities or how they were treated better), aff'd,705 F. App'x 50 (2d Cir. 2017) (summary order).  Here, the TAC and plaintiff's opposition are "completely devoid of any reference to 'similarly situated' or 'substantially similar' individuals."  Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 434 (S.D.N.Y. 2013).  Thus, even considering

the new allegations included in his opposition, they are not sufficient to support an equal protection claim.

Accordingly, plaintiff's equal protection claim must be dismissed.

V.      Section 1983 Personal Involvement

All the individual defendants argue plaintiff's Fourth and Fourteenth Amendment claims against them must be dismissed because plaintiff has failed to plead their personal involvement in an alleged constitutional violation.

The Court disagrees as to the Connecticut State Trooper Defendants and defendant Koonitsky, whose alleged personal involvement in the alleged Fourth Amendment search and seizure and Fourteenth Amendment procedural and substantive due process violations is, as explained above, sufficient to withstand a motion to dismiss.  Thus, the Court declines to dismiss those claims against those defendants for lack of personal involvement.

However, the Court agrees plaintiff has failed plausibly to allege the personal involvement of defendants First Selectman Del Monaco, Selectman Hall, and Selectman Hansen.

A.      Legal Standard

To state a claim under Section 1983, a plaintiff must allege facts showing defendants' direct and personal involvement in an alleged constitutional deprivation.  See Spavone v. N.Y.S. Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").  Therefore, to state a claim under Section 1983 against government officials, "a plaintiff must plead . . . that each Government-official defendant, through the official's own actions, has violated the constitution."  Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020).

A defendant may not be held liable under Section 1983 solely because that defendant employs or supervises a person who violated the plaintiff's rights.  Ashcroft v. Iqbal, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."); Tangreti v. Bachmann, 983 F.3d at 619–20.

      B.    First Selectman Del Monaco, Selectman Hall, and Selectman Hansen

Plaintiff has not alleged First Selectman Del Monaco, Selectman Hall, and Selectman Hansen were present during or otherwise personally involved in the unlawful search and seizure or due process violations allegedly committed by the other defendants.  At best, plaintiff offers conclusory allegations concerning a purported failure of First Selectman Del Monaco, Selectman Hall, and Selectman Hansen to adequately train or supervise their subordinates.  "Such allegations, without facts to suggest that [these defendants'] failure to train or supervise [their] subordinates was [a] deliberate choice or that [they were] aware of a specific deficiency in the training program, may not establish a basis for individual liability against [them]."  Ryan v. Moss, 2013 WL 956722, at *17 (W.D.N.Y. Mar. 12, 2013); see also Houghton v. Cardone, 295 F. Supp. 2d 268, 276–77 (W.D.N.Y. 2003) (conclusory allegations of failure to train, supervise, review, or reprimand insufficient to state a Section 1983 claim against individual supervisory defendant in his individual capacity).

Accordingly, the claims against defendants First Selectman Del Monaco, Selectman Hall, and Selectman Hansen must be dismissed for lack of personal involvement.

VI.    Section 1983 Claims Against the Town and the Office

The Town and the Office argue plaintiff's Section 1983 claims against them must be dismissed because plaintiff fails plausibly to allege the requirements of Monell v. Department of Social Services, 436 U.S. 658 (1978) ("Monell").

The Court agrees.

A.    Legal Standard

Under Monell, a municipality is liable under Section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury."  436 U.S. at 694.
Thus, to assert a Section 1983 claim against a municipality, the plaintiff must show the existence of an official policy or custom causing injury and a direct causal connection between the policy or custom and the deprivation of a constitutional right.  Jones v. Town of East Haven, 691 F.3d 72, 80–81 (2d Cir. 2012).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:  (i) "a formal policy officially endorsed by the municipality"; (ii) "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question"; (iii) "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware"; or (iv) "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."  Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010).

To adequately plead a policy or custom, a plaintiff must allege more than one instance of a constitutional violation.  See DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."); see also Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 14 (2d Cir. 2015) (summary order) (affirming dismissal of Monell claim

and noting, "other than the plaintiff, the amended complaint provides only one additional example of a similar incident").

Moreover, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." Cash. v. Cnty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011).

"Where, however, [Monell] liability is premised on the policymaker's approval of a subordinate's unlawful act, it must be shown that the policymaker ratified the subordinate's decision and the basis for it, as municipalities cannot be liable on a theory of respondeat superior." Davis v. City of New York, 75 F. App'x 827, 829 (2d Cir. 2003) (summary order). Further, "there must be well-pleaded allegations in the complaint supporting the inference that the [municipality] employed a policy of ratifying the unlawful conduct of its officers:  a single instance of ratification is insufficient." Wilson v. Cnty. of Ulster, 2022 WL 813958, at *16 (N.D.N.Y. Mar. 17, 2022).

"While Monell claims are not subject to a 'heightened' pleading standard beyond that defined in Rule 8(a)(2), such claims nevertheless must meet the plausibility requirements of" Bell Atlantic Corp. v. Twombly, 550 U.S. at 572, and Ashcroft v. Iqbal, 556 U.S. at 678. See Guzman v. United States, 2013 WL 5018553, at *4 (S.D.N.Y. Sept. 13, 2013) (quoting Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit, 507 U.S. 163, 168 (1993)). "In other words, boilerplate allegations will not suffice." Id.  "The allegations that [a defendant] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient." Missel v. Cnty. of Monroe, 351 F. App'x 543, 545 (2d Cir. 2009). (summary order).

17

B.      Analysis

Here, plaintiff attempts to plead a Monell claim under an array of theories—each of which fails.

For example, plaintiff alleges it is a custom and policy of the Town and the Office "to fail to exercise reasonable care in hiring its police officers . . . and failing to adequately prevent constitutional violations on the part of" officers."  (TAC ¶ 119).  However, these are conclusory allegations that do not "challenge an express rule or regulation" or a practice "so persistent or widespread as to constitute a custom or usage," and thus, are insufficient to state a claim under Monell.  See Green v. Dep't of Educ. of the City of N.Y., 16 F.4th 1070, 1077 (2d Cir. 2021) ("[A] general and conclusory allegation of a municipal policy or custom fails to state a plausible claim.").

Moreover, plaintiff's "allegations in this regard are only of his own experience," and do not provide examples involving others or even support "the existence of a municipal policy or practice."  Fuentes v. Schemmer, 2023 WL 188739, at *14 (S.D.N.Y. Jan. 13, 2023); see Smith v. Westchester Cnty., 2019 WL 5816120, at *5 (S.D.N.Y. Nov. 7, 2019) (dismissing Monell claim where plaintiff's complaint "describe[d] only his own experiences").

Likewise, plaintiff's allegations that the Town and the Office failed adequately to train and supervise the troopers and acted with deliberate indifference to citizens' rights are "boilerplate assertions" that do not "allege a specific deficiency in the municipality's training," and thus are insufficient to state a claim for municipal liability.  See Rivera v. Westchester Cnty., 488 F. Supp. 3d 70, 78 (S.D.N.Y. 2020).

Similarly, plaintiff cannot state a Monell claim based on an alleged deliberate indifference because he "makes no concrete allegations as to the deliberate indifference of any policymaking official."  Shaheed v. City of New York, 2017 WL 3055040, at *8 (S.D.N.Y. July

17, 2017).  Although plaintiff argues these alleged customs "demonstrate a deliberate indifference" by the Town and the Office because they allow officers to "believe[] that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated," plaintiff does not allege any facts which suggest any instances when the Town or the Office failed to monitor, investigate, or sanction misconduct.  (TAC ¶¶ 122–123).

Thus, plaintiff's allegations regarding deliberate indifference are conclusory and insufficient to state a claim.  See Canner v. City of Long Beach, 2014 WL 2862791, at *11 (E.D.N.Y. June 23, 2014) (dismissing Monell claim because "plaintiffs' allegations of 'a failure by official policymakers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact' are nothing more than conclusory"), mot. for reconsideration granted on other grounds, 2015 WL 590270 (E.D.N.Y. Feb. 11, 2015).  Without facts "indicat[ing] a deliberate choice by" a "municipal policymaker[] to engage in unconstitutional conduct," plaintiff's claim fails and must be dismissed.  See Araujo v. City of New York, 2010 WL 1049583, at *9 (E.D.N.Y. Mar. 19, 2010).

Finally, to the extent plaintiff attempts to plead Section 1983 liability based on respondeat superior, municipalities cannot be held liable on such a theory.  Davis v. City of New York, 75 F. App'x at 829.

Accordingly, plaintiff's Section 1983 claims against the Town and the Office must be dismissed.

## VII.   Qualified Immunity

The Connecticut State Trooper Defendants and defendant Koonitsky argue the defense of qualified immunity protects them from liability on plaintiff's constitutional claims.

The Court disagrees, at least at this stage of the case.

Qualified immunity shields government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."  Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996).  "Defendants bear the burden of establishing qualified immunity."  Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

"[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion."  Hyman v. Abrams, 630 F. App'x 40, 42 (2d Cir. 2015) (summary order).  However, "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if the facts supporting the defense appear on the face of the complaint."  Id.

As explained above, plaintiff plausibly alleges defendants Tharas, Olsowy, King, and Koonitsky violated his clearly-established rights under the Fourth Amendment to be free from unreasonable search and seizure, and under the Fourteenth Amendment to substantive and procedural due process.  And, accepting plaintiff's allegations as true and drawing all reasonable inferences in his favor, including as to the immunity defense, Hyman v. Abrams, 630 F. App'x at 42, the Court cannot conclude it was objectively reasonable for these defendants to believe their actions did not violate such laws.  Therefore, at this early stage of the case, these claims cannot be dismissed on qualified immunity grounds.  This issue may be revisited on summary judgment after the close of discovery.

VIII.   <u>State Law Claims Against the Town and the Office</u>

Defendants the Town and the Office argue plaintiff's state-law claim for intentional infliction of emotional distress must be dismissed for failure to state a claim.

The Court agrees.

To state a claim for intentional infliction of emotional distress under New York law, a plaintiff must allege "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." <u>Howell v. N.Y. Post Co.</u>, 81 N.Y.2d 115, 121 (1993).  "In practice, courts [tend] to focus on the outrageousness element, the one most susceptible to determination as a matter of law." <u>Id</u>.  "[T]he requirements of the rule are rigorous, and difficult to satisfy. . . .  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id</u>. at 122.  Intentional infliction of emotional distress "remains a highly disfavored tort under New York law." <u>Turley v. ISG Lackawanna, Inc.</u>, 774 F.3d 140, 158 (2d Cir. 2014).

Here, although as alleged the defendant police officers' conduct plausibly states claims for violations of the Fourth and Fourteenth Amendments, even drawing all reasonable inferences in plaintiff's favor, the alleged conduct is plainly not so outrageous and extreme as to exceed the bounds of decency.  Nor could it plausibly be regarded as atrocious or utterly intolerable in a civilized community.

Accordingly, plaintiff's intentional infliction of emotional distress claim must be dismissed.

Defendants do not move to dismiss plaintiff's state law claims for trespassing, negligence, and false imprisonment.  Thus, these claims may proceed.

**CONCLUSION**

The motions to dismiss are GRANTED IN PART and DENIED IN PART.

The following claims shall proceed: Plaintiff's Fourth Amendment search and seizure claims against defendants Tharas, Olsowy, King, and Koonitsky; plaintiff's Fourteenth Amendment procedural and substantive due process claims against defendants Tharas, Olsowy, King, and Koonitsky; and plaintiff's state law claims for trespassing, negligence, and false imprisonment against defendants Town of New Fairfield and New Fairfield Resident Trooper's Office.

All other claims are dismissed.

The Clerk is instructed to terminate First Selectman Patricia Del Monaco, Selectman Khris Hall, and Selectman Kim Hansen as defendants in this action.

By October 24, 2023, the remaining defendants shall file an answer to the third amended complaint.

By separate Order, the Court will schedule an initial conference in this case, to be held at the same time as the scheduled case management conference in the related case of Rivera v. Varbero, 22-cv-1877 (VB), on November 8, 2023, at 3:00 p.m.

The Clerk is instructed to terminate the motions.  (Docs. ##71, 75).

Dated: October 10, 2023
       White Plains, NY

                            SO ORDERED:

                            Vincent L. Briccetti
                            United States District Judge